

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

ATLAS SHIPPING A/S,                              :      08 Civ. _____

                              Plaintiff,         :

     - against -                                 :

CASTOR STAR MARITIME S.A.,                       :

                              Defendant.         :
-----------------------------------------------------------------X

## VERIFIED COMPLAINT

Plaintiff, ATLAS SHIPPING A/S ("Plaintiff"), by and through its attorneys, Lennon,

Murphy & Lennon, LLC, as and for its Verified Complaint against the Defendant, CASTOR

STAR MARITIME S.A. ("CSM" or "Defendant"), alleges, upon information and belief, as

follows:

1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333. Jurisdiction over this

matter is also present pursuant to the Federal Arbitration Act, 9 United States Code § 1 *et seq.*,

and this Court's federal question jurisdiction, 28 United States Code § 1331.

2.      At all times material to this action, Plaintiff was, and still is, a foreign company

duly organized and operating under foreign law with an address in Copenhagen, Denmark.

3.      Upon information and belief, Defendant was, and still is, foreign corporation, or

other business entity organized and existing under foreign law.

4.      At all material times Plaintiff was, and still is, an operator of sea going Vessels

and is involved in the carriage and delivery of bulk cargoes by sea.

5.     Pursuant to a charter party dated November 10, 2003, Plaintiff chartered the motor vessel "CASTOR STAR" (then named the "PATHFINDER") (hereinafter the "Vessel") from her Owners at that time, non-party Altapride Company Limited ("Altapride"), for a minimum period of 12 months and a maximum period of 36 months. The exact period was to be at Plaintiff's option. See *November 10, 2006 charter party annexed hereto as Exhibit "1."*

6.     Pursuant to clause 81 of the charter party, Plaintiff had the option to purchase the Vessel at any time during the charter.

7.     By a Memorandum of Agreement dated April 4, 2004, Plaintiff and Altapride mutually agreed on the terms of a prospective sales contract, (i.e. memorandum of agreement) as contemplated by clause 81 of the charter party.

8.     The Vessel was delivered into service under the time charter on November 28, 2004.

9.     While the Vessel was on charter to Plaintiff, by a Memorandum of Agreement dated August 8, 2006 ("MOA"), non-party Multibulk Marine Management S.A. ("Multibulk") contracted to buy and the Vessel's former Owners, Altapride, contracted to sell the Vessel.

10.    More particularly, Multibulk entered into the MOA to purchase the Vessel on behalf of a company later to be nominated.   The company later nominated was CSM.

11.    On or about September 4, 2006, a Tripartite Agreement was signed by Defendant CSM as buyers, Altapride as sellers and Plaintiff Atlas as charterer, which novated the November 10, 2003 charter party. See *Tripartite Agreement dated September 4, 2006 annexed hereto as Exhibit "2."*

12.     On October 16, 2007, Atlas exercised its option to purchase the Vessel as provided for under the November 10, 2003 charter party and subsequent novation dated September 4, 2006. A dispute arose thereafter between Plaintiff and CSM as to the validity of the said option to purchase.

13.     The charter party provided that all disputes were to be resolved in arbitration with English Law to apply.

14.     Therefore, Plaintiff initiated arbitration proceedings against CSM in relation to the above dispute and ultimately a written settlement (the "Deed of Settlement") was reached between the parties on November 29, 2007. *See Deed of Settlement dated November 29, 2007 annexed hereto as Exhibit "3."*

15.     Pursuant to the Deed of Settlement CSM accepted the following:

     a.     The Vessel had underperformed since departure from Kohsichang on her present voyage, and that the estimated time lost as a result of the underperformance was 11 days;

     b.     The Vessel was off-hire in Kohsichang for the Master's failure to sign the bills of lading for two days;

     c.     The final hire statement would reflect the above items.

16.     On or about December 20, 2007, at Dakar, Senegal, Plaintiff redelivered the Vessel to CSM.

17.     A dispute then arose between the parties regarding CSM's failure to make certain deductions to the hire allegedly owed from Plaintiff in breach of the charter party, novation thereof and/or Deed of Settlement.

18.    Taking into account the various deductions which CSM failed to make in breach of the charter party, novation thereof and/or the Deed of Settlement, Plaintiff is owed approximately $221,658.20 from CSM.

19.    The deductions which CSM failed to take into account are detailed more fully below.

20.    CSM failed to deduct $4,650.00 for fuel oil [MDO] consumption during 2 days the Vessel was off-hire at Kohsichang (2.5 mt per day) in breach of the charter party, novation thereof and/or the Deed of Settlement.

21.    CSM failed to deduct the amounts of $48,510.00 and $35,154.00 for fuel oil over consumption [IFO and MDO] by the Vessel while en route from Kohsichang (121.275 mt IFO at $400.00 per mt / 37.8 mt MDO at $930.00 per mt) in breach of the charter party, novation thereof and/or the Deed of Settlement.

22.    CSM failed to deduct off-hire in the approximate amount of $5,747.94 when fuel oil bunkers were supplied to the Vessel at Dakar and the Vessel suffered a crane breakdown in breach of the charter party, novation thereof and/or the Deed of Settlement.

23.    CSM failed to deduct hire in the approximate amount of $1,215.01 for fuel oil [MDO] consumption for .7477 days of Vessel off-hire at Dakar in breach of the charter party, novation thereof and/or the Deed Settlement.

24.    CSM failed to properly calculate/deduct the value of the Vessel's fuel oil bunkers upon redelivery (approximately $90,900.00) in breach of the charter party, novation thereof and/or the Deed of Settlement.

25.    CSM failed to deduct certain Owners Expenses in the approximate amount of $8,617.11 in breach of the charter party, novation thereof and/or the Deed of Settlement.

26.     As a result of CSM's breach of the charter party, novation thereof and/or the Deed of Settlement, as best as may be reasonably approximated, Plaintiff has and/or will sustain damages in the total principal amount of $221,658.20, exclusive of interest, arbitration costs and attorney's fees.

27.     Pursuant to the charter party, novation thereof and/or the Deed of Settlement, all disputes between the parties are to be submitted to arbitration in the city of London, England with English Law to apply.

28.     The Deed of Settlement specifically provides that "this Agreement is subject to English Law and the exclusive jurisdiction of the Tribunal appointed in the Reference."

29.     Despite due demand, CSM has failed and/or refused to pay or provide security for the sums due and owing to Plaintiff.

30.     Therefore, Plaintiff is in the process of referring this claim to the existing London Arbitration Tribunal as the same were appointed to hear any and all disputes arising under the charter party, novation thereof and/or the Deed of Settlement.

31.     Interest, costs and attorneys' fees are routinely awarded to the prevailing party in arbitration pursuant to English Law. As best as can now be estimated, Plaintiff expects to recover the following amounts in the arbitration:

| | | |
|---|---|---|
| A. | Principal Claim: | $221,658.20 |
| B. | Estimated Interest on claims:<br>2 years at 6.5%, compounded quarterly | $30,508.81 |
| C. | Attorneys' fees: | $150,000.00 |
| D. | Arbitration costs/expenses: | $60,000.00 |
| **Total:** | | **$462,167.01** |

32.     The Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of one or more garnishees which are believed to be due and owing to the Defendant.

33.     The Plaintiff seeks an order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, and also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching, *inter alia*, any assets of the Defendant held by any garnishees within the District for the purpose of obtaining personal jurisdiction over the Defendant, and to secure the Plaintiff's claim as described above.

**WHEREFORE,** Plaintiff prays:

A.     That process in due form of law issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Verified Complaint;

B.     That the Court retain jurisdiction to compel the Defendant to arbitrate in accordance with the United States Arbitration Act, 9 U.S.C. § 1 *et seq.*

C.     That since the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any

other funds held by any garnishee within the District which are due and owing to the Defendant, in the amount of $462,167.01 calculated to date to secure the Plaintiff's claim, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

D.     That this Court recognize and confirm any arbitration award(s) or judgment(s) rendered on the claims set forth herein as a Judgment of this Court;

E.     That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

F.     That this Court award Plaintiff its attorneys' fees and costs incurred in this action; and

G.     That the Plaintiff have such other, further and different relief as the Court may deem just and proper.

Dated: February 8, 2008
       New York, NY

The Plaintiff,
ATLAS SHIPPING A/S

By: _____

Kevin J. Lennon
Patrick F. Lennon
Nancy R. Peterson
LENNON, MURPHY & LENNON, LLC
420 Lexington Ave., Suite 300
New York, NY 10170
(212) 490-6050 – phone
(212) 490-6070 – fax
kjl@lenmur.com
pfl@lenmur.com
nrs@lenmur.com

## ATTORNEY'S VERIFICATION

State of New York   )
                    )        ss.:      City of New York
County of New York  )

1.      My name is Kevin J. Lennon.

2.      I am over 18 years of age, of sound mind, capable of making this

Verification, and fully competent to testify to all matters stated herein.

3.      I am a partner in the firm of Lennon, Murphy & Lennon, LLC, attorneys for the

Plaintiff.

4.      I have read the foregoing Verified Complaint and know the contents

thereof and believe the same to be true and accurate to the best of my knowledge, information

and belief.

5.      The reason why this Verification is being made by the deponent and not

by the Plaintiff is that the Plaintiff is a business organizations with no officers or directors now

within this District.

6.      The source of my knowledge and the grounds for my belief are the

statements made, and the documents and information received from, the Plaintiff and agents

and/or representatives of the Plaintiff.

7.      I am authorized to make this Verification on behalf of the Plaintiff.

Dated:       February 8, 2008
             New York, NY

                                              Kevin J. Lennon

# EXHIBIT 1



# COPY
# Time Charter

GOVERNMENT FORM

*Approved by the New York Produce Exchange*
November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946



**This Charter Party,** made and concluded in *Copenhagen,* ............. 10th day of November, 2003 ...............

Between *Atlaspride Company Limited, Nicosia, Cyprus* ......................................................................

Owners of the good ........................... steam/by Motorship .."*PATHFINDER*" - (See description Clause 77 and 82) of

.......................... cargo capacity, and ..........................

............................... of about ........................... cubic feet bale capacity, and about ..........................

deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding ..........................

allowing a minimum of fifty tons) on a draft of ..........................

which on a line capacity of about ..........................

.......................... hereto as a consumption about ..........................

now ..........................

.......................... and *Atlas Shipping A/S* .......................... Charterers of the City of *Copenhagen* ..........................

## Witnesseth, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

about Worldwide period Charter, min. 12 months / max. 35 months, exact period in Charterers' option. Trading always afloat, Charterers' option NAABSA as per NYPE Cl. 6 and within IWL, however, Charterers have the option to break IWL against paying additional premium which not to exceed lowest obtainable quote from Lloyds of London for single vessel cover premium to be confirmed by Charterers in writing prior entering IWL within below mentioned trading limits.

Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for the fulfilment of this Charter Party. Acceptance of delivery by Charterers shall not constitute any waiver of Owners' obligations hereunder. Acceptance of redelivery by Owners shall not constitute any waiver of Charterers' obligations under the Charter Party.

Vessel to be placed at the disposal of the Charterers, at as and upon being redelivered by Messrs. Buwg, any time, day or night, Sundays and Holidays included (see Clause 23)

in such dock or at such wharf or place (where the ship may safely lie, always afloat, at all times of tide, except as otherwise provided in Clause No. 6) as the Charterer may direct. If such dock, vessel or place have available time to complete ...

subsequent load port at the first voyage delivery to as ready to receive any permissible cargo to Charterers'/Surveyors' satisfaction. Should vessel fail fail to pass such survey the vessel to be off hire from time of arrival load port(s) until failure is rectified (See Clause 50), On delivery and throughout the Charter vessel to be ... tight, staunch, strong and in every way fitted for the service, having won ballast, ... and donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the engines at once and the same time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed in carrying lawful merchandise ...

Amador, under United States of America, under West Indies, under Central America, under Caribbean Sea, under Gulf of Mexico, under Mediterranean South America ...

Trading exclusions, see Clause 31.

is the Charterers or their Agents shall Clause, on the following conditions:

1. That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; shall pay for the insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her clean and keep the vessel in a thoroughly efficient state in hull, cargo spaces, machinery and equipment **with all certificates necessary to comply with current requirements at ports of call for** and during the service.

2. That whilst on hire the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, compulsory Pilotages, **but it is understood that pilotages for Bosporus Strait, Great Belt and Torres Strait to be for Charterers' account** Agencies, (except agency fee directly related to Owners' matters), Commissions,

Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into a port for causes for which vessel either her Owners are responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

illness of the crew or cargoes carried prior to delivery to be for Owners account. Fumigations ordered because of cargoes carried or been visited while vessel is employed under this

charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period

of six months season.

Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or usual cargo, but Owners to allow them the use of any dunnage and shifting boards *already aboard vessel, Charterers making good any damage thereto*. Charterers to have the privilege of using shifting boards for dunnage, they making good any damage thereto.

~~That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all the remaining on board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than ...... tons and not more than ...... tons and not more than ...... tons and not be delivered with not less than~~ ...... ~~not and not more than~~ ...... *See Clause 44*

4. That the Charterers shall pay for the use and hire of the said Vessel at the *daily* rate *including overtime* at USD 7,800.- *for first 12* ...... *months / USD 8,050.- for 13th to 24th month / USD 3,300.- for 25th to 26th months* United States Currency per calendar ton. ~~for six-eight carrying capacity, including ladles and~~ ......

~~commencing~~ ...... Current hereboard, per Calendar Month, commencing on and from the day of her delivery, as aforesaid, and at and after the same rate for any part of a *day* month, hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary wear and tear excepted, to the Owner (unless lost) as as *per Clause 78* ......

...... ...... ......

...... ~~unless otherwise mutually agreed.~~ Charterers are to give Owners not less than 20 ...... days notice of vessels expected date of re-delivery with redelivery area, and probable port *and thereafter 12/11/9 days approximate notice of* vessel's approximate date and probable port, then 5 days definite notice and thereafter daily notice of definite redelivery and definite port.

5. Payment of said hire to be made in New York in cash in United States Currency, *every 15 days semi-monthly* in advance, and for the last *15 days* half month or ...... part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the hire, or bank guarantee *or deposit*, or on any *fundamental* breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Charterers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from~~ ...... ~~on the working day following that on which written notice of withdrawal has given to Charterers so bank Agents before 4 p.m., but if required by Charterers, they~~ ~~to have the privilege of using vessel at once, such time used to count as hire. See Clause 64.~~

Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application of such advances.

6. That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place or anchorage *in port or elsewhere* that Charterers or their Agents may direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessels to safely lie aground.

7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew, tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers paying Owners~~ ...... ~~per passenger for accommodations and meals. However, it is agreed that it is not expressly prohibited and~~ ~~owners to be responsible for the damage of passengers. Charterers to bear such risks and expense.~~ No passengers allowed.

8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to load, stow, and trim the cargo at their expense under the supervision of the Captain, who is to sign, or when required by *Charterers, authorize the Charterers or their agents to sign* Bills of lading *on his behalf for* cargo as presented, in conformity with Mate's or Tally Clerk's receipts.

9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

10. That the Charterers shall at *their own risk* have permission to appoint a Supercargo, who shall accompany the vessel and see that the voyages are prosecuted with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the rate of USD 10.30 £4.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally Clerks, Stevedore's Foreman, etc., Charterers paying *Owners USD 1,150.00 lumpsum per month/pro rata* at the current rate as much, for *Charterers'* all such victualling, *communication and entertainment*.

11. That the Charterers shall furnish the Captain from time to time will all requisite instructions and sailing directions, in writing, and the Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Charterers, their Agents or Supercargo, when required, with a true copy of *daily deck and engine* Logs, showing the course of the vessel and distance run and the consumption of fuel, *as well as revolutions of main engine and velocity of and direction of wind and sea, all in English language*.

12. That the Captain shall use diligence in caring for the ventilation of the cargo.

13. ~~That the Charterers shall have the option of continuing this charter for a further period of~~ ...... 

...... ~~on giving written notice thereof to the Owners or their Agents~~ ...... ~~days previous to the expiration of the first named term, or any named term, any declared option.~~

14. That if required by Charterers, time not to commence before 15th July, 2004, 00:01 hours local time ...... and should vessel not have given written notice of readiness delivered on or before 25th October, 2004 ...... but not later than 24:00 hours local time Charterers or their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness. Owners to narrow layout to a 30 day spread latest 20 days prior first loyday of such 30 day spread laycan. Owners then to narrow layout to a 10 day spread latest 20 days prior first loyday of such 10 days spread layout.

15. That in the event of the loss of time from deficiency and/or default and/or strike of men employed by Owners or deficiency of stores,

fire, breakdown or damages to hull, machinery or equipment,
grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other similar cause preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence thereof, and all extra *directly resulting and proven* expenses shall be deducted from the hire.

16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas, Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the purpose of saving life and property.

17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at *London New York*, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for the purpose of enforcing any award this agreement may be made a rule of the Court. The Arbitrators shall be *members of the LMAA*. *further Arbitration Clause 39.*

18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Average contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel.

19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules 1 to 15, inclusive, 17 to 22 inclusive and Rule 7 at York-Antwerp Rules 1924, *1950 and subsequent revisions at London, unless Charterers' sub-charter parties provided otherwise, in which event Owners shall submit to Charterers, sub-charterers' Jurisdiction Clause when requested by Charterers* at such port to ...

153
154
155
156
157
158
159
160
161
162
163
164
165
166
167
168
169
170
171
172
173
174
175
176
17.
1.
1.
178
175
175
175
175
175
175
175
175
175
172

*Lightship Chartering A/S, Copenhagen* ......................................................................................

*Clauses 29 through 83, as attached, are fully incorporated in this Charter Party.*

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under license from the Association of Ship Brokers & Agents (U.S.A.) Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

10

29. Jan. 2008 20:31                                                            No. 5590    P. 9

ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 13TH NOVEMBER 2003
MV "PATHFINDER"



**Clause 29:**
Owners are obliged to deliver and keep the vessel, her crew and anything pertaining hereto supplied with up-to-date and complete certificates, approvals, equipment and fittings, enabling the vessel and her crew to load, carry, discharge all cargoes permitted under this Charter Party and bunker within the trading limits of this Charter Party, even where such certificates become necessary before or after the commencement of this Charter Party.

**Clause 30: Cargo Exclusions:**
Charterers are to load, stow, trim, lash, secure, dunnage, tally and discharge cargo at their risk and expense in accordance with IMO and other local regulations. The following cargoes are specifically excluded:

Arms, ammunition, asphalt, acids, asbestos, bombs, borax, borings, black powder, blasting caps; calcium carbide, calcium oxide, castor beans, creosoted goods, calcium hypochlorite, cocoa, copra products, cotton, containers, dynamite, explosives, sunflowerseed expellers, ferro silicon, hides, kaolin, logs, livestock, motor spirit, motor blocks and turnings, military equipment; mobile homes, modular homes; nuclear substances, naptha; oilcakes but soyabeanmeals allowed; pitch, petroleum and it's products but petcoke is specifically allowed, refrigerated cargo, radio active substances, seedcakes but citrus pulp pellets are specifically allowed, tar and it's products, talc, bé, zinc ashes.

- DRI/HBI allowed but max 3 cargoes per year - Charterers paying lumpsum USD 15,000 (if DRI/HBI is loaded twice then no additional money falls due i.e. USD 15,000 lumpsum is paid once and for all) to cover expenses for special preparation of loading/ discharge of cargo
- No fishmeal allowed
- Bulk cement allowed but Charterers paying USD 5,000/lumpsum for each shipment of bulk cement (but no additional payment for bulk cement clinker, which allowed) In case bulk cement is loaded and holes are to be cut in hatchcovers, same to be cut/welded at Charterers time and expense and always under class surveyors' supervision.
- Bulk salt/bulk sulphur not to be first cargo after delivery. In case salt is loaded, holds to be first whitewashed at Charterers' time and expense and at Masters' satisfaction.
- Steel scrap/hms 1+2/shredded scrap allowed basis non-oily and excl. motorblocks and turnings - Softloading clause to be mutually agreed
- Ammonium Nitrate: Max two cargoes per year and not to be consecutive – no cargo to be loaded in hold no. 5.

**Clause 31: Trading Exclusions.**
Charterers warrant that they will trade the vessel between safe port(s), safe berth(s), safe anchorage(s) and safe place(s), always safely afloat, Charterers' option NAABSA as per clause 5 of NYPE unamended; the following countries are specifically excluded:

Albania, Angola (including Gabinda), Iraq except for U.N. approved cargoes, Republic of Congo, Democratic Republic of Congo (formerly Zaire), Cuba, Eritrea, Finland, Haiti, Israel, Israeli territories, Kamptchea, Liberia, Libya, Namibia, North Korea, CIS Pacific, Somalia, Yemen, New Zealand, Australia.
Sweden/Denmark allowed but Charterers to pay to Owners USD 15,000 lumpsum for each call (if vessel both discharges and loads there without any intermediate calls then USD 15,000 lumpsum to be paid once only).

War zones are excluded when the additional war risk premium exceeds 1 pct for vessel's 7-days-stay. Additional war risk premium and crew war bonus to be paid by Charterers against presentation of original invoice from vessel's underwriters. Crew war bonus not to exceed USD 50/per day per crew member, USD 100/per officer.

Countries/areas under official United Nations sanction/embargo are also excluded from trading.

11

29. Jan. 2008 20:32                                                                 No. 5090    P. 10

ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 10TH NOVEMBER 2003
MV "PATHFINDER"



Charterers guarantee that they will not trade the vessel directly between People's Republic of China and
Taiwan or vice verse.

Basic war risk insurance on vessel to be for owners' account

If a country/area is declared war zone after the commencement of the voyage then the vessel is allowed to
proceed and the governing war risk clause (CONWARTIME 1993) is to apply.

**Clause 32:  Crew Service.**
With reference to Clause 8 of this Charter Party "customary assistance" shall include, but not be limited to:

a) First/last opening and closing of hatches, when and where required, if permitted by local regulations.
b) Raising and lowering of derricks and rigging cranes, if fitted and/or gangways in preparation for loading
   and discharging.
c) Deleted.
d) Shaping up vessel's holds/hatches and cranes prior arrival at loading and/or discharging places so as to
   immediately commence loading and/or discharging operations subject to weather conditions and the
   safety of the crew.
e) Deleted.

The above services shall be considered as a minimum and shall in no way be construed as an alternative to
or reduction in the standard of services from Officers and crew required under this Charter Party.

**Clause 33: Grab**
All vessel's cranes and grabs are at Charterers' free disposal and Owners confirm that all vessel's cranes and
grabs are in good working condition.

**Clause 34:  Deleted.**

**Clause 35:  In Lieu of Hold Cleaning.**
Charterers shall have the option of redelivering the vessel without cleaning of holds against paying the
Owners a lumpsum USD 7,000 (USD 4,500 if last cargo grain/grain products) in lieu of cleaning including
dunnage removal, but subject that port authorities permit same.

**Clause 36**
Charterers have the option to carry one original Bill of Lading in ship's bag in which case all originals shall be
marked "One original Bill of Lading retained on board vessel against which Bill of Lading delivery of cargo
may properly be made on instructions received from Charterers."

**Clause 37:  Intermediate Hold Cleaning**
Master/crew to assist fully with intervoyage cleaning at Charterers' time, Charterers paying crew USD 500
per hold for such work. Owners not to be responsible should vessel fall next employment due to insufficient
hold cleaning of cargoes carried under this charter.

**Clause 38:  Ice Trading**
Notwithstanding other conditions in any other clause in this C/P to the contrary and it has specifically being
agreed that vessel is allowed to follow icebreakers where same is customary for vessels of similar size and
class in Baltic/St Lawrence/Black Sea.

Charterers to arrange efficient and adequate icebreaker assistance at their risk and expense. Charterers will
endeavour to arrange that the vessel will be the first in line after the icebreaker but in any case they will
confirm that vessel will be 2nd in line. Ice advisors to be for Charterers account.

pathfinder 10.11.2003 tc atlas                    - 2 -

12



ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 10ᵀᴴ NOVEMBER 2003
MV "PATHFINDER"

If on account of the ice the master considers it is dangerous to remain in the loading or discharging place for fear of vessel being frozen in or damaged, deems it advisable to leave, he has liberty to do so with what cargo he has on board/ discharged and to proceed to a convenient open space or any other port or ports to complete loading/discharge. The vessel will remain on hire in such case. Any dispute between master and Charterers regarding sailing/leaving due danger due to ice, both parties to follow advises of the competent authority which decision to be valid.

Charterers to remain responsible for any damage, loss, costs and any other expenses whatsoever arising directly from vessel following ice breakers on the basis of the terms of this clause however any damage caused by navigational hazards like e.g. damage to vessel's propeller and rudder and hull will always be for Owners' account and Owners will remain responsible for any such damages.

## Clause 39: Arbitration Clause.
This Charter Party shall be governed by English Law.
It is hereby agreed that all claims below USD 50,000.00 excluding interest and costs, shall be settled as per current LMAA small claims procedures.

## Clause 40: Arrest.
Should the vessel be arrested during the currency of this Charter at the suit of any person including Charterers having or purporting to have a claim against or any interest in the vessel, hire under this Charter party shall not be payable in respect of any period whilst the vessel remains under arrest or remains unemployed as a result of such arrest, and the Owners shall reimburse to the Charterers any proven directly related expenses which they may incur in respect of such arrest, provided not already covered by non-payment of charter hire. Owners in any case being liable to the extent that Charterers' operations are hindered.

This Clause shall not apply should the arrest be caused through any fault on the part of Charterers.

## Clause 41:
Deleted

## Clause 42: Bills of Lading.
Charterers' Bills of Lading to be used if required by Charterers.

In case the Original Bill(s) of Lading are not available upon vessel's arrival at discharging port for any reason, the Master is to release the entire cargo to the Charterers' order against presentation by Charterers or their Agents of a single Letter of Indemnity with wording as per Owners standard P. & I. Club form, signed by Charterers only. Discharge to commence on receipt by Owners of faxed copy of the L.O.I.

Should Charterers require vessel to change discharging port after Bill of Lading have been issued Owners to comply with such instructions upon receipt of a faxed copy of a single L.O.I. signed by Charterers only and issued in conformity with Owners standard P. & I. Club form.

Attached please find the standard forms of Letters of Indemnity to be given in return for:
a) Delivering cargo without production of the Original Bill of Lading.
b) Delivering cargo without production of the Original Bill of Lading incorporating a bank's agreement.
c) Delivering cargo without production of the Bill of Lading.
d) Delivering cargo at a port other than that stated in the Bill of Lading incorporating a bank's agreement
e) Delivering cargo at a port other than that stated in the Bill of Lading and without production of the Original Bill of Lading
f) Delivering cargo at a port other than that stated in the Bill of Lading and without production of the Original Bill of Lading incorporating a bank's agreement.

pathfinder 10.11.2003 to atlas                                    - 3 -

13



ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 10TH NOVEMBER 2003
MV "PATHFINDER"

When and if required Charterers may place one Original Bill of Lading on board, against which Bill of Lading delivery cargo to take place on instructions received from Shippers/Charterers, and all Original Bills of Lading to be marked accordingly.

**Clause 43: Bulldozers.**
Charterers to have the option to use rubber-tyred bulldozers only in vessel's holds, provided not exceeding the tank top strength and subject to master's approval, which not to be unreasonably withheld.

If required, vessel to lift onboard, shift from hold to hold and discharge the bulldozers by use of vessel's gear.

**Clause 44: Bunkers.**
Bunkers on delivery about 500-900 mts IFO and about 190-190 mts MDO. Bunkers on redelivery about same quantities as on delivery. Prices both ends to be USD 165.00 pmt IFO and USD 260 pmt MDO.

Charterers to pay bunkers value on delivery together with 1st hire payment and Charterers have the right to deduct estimated value of redelivery bunkers from last sufficient hire payment.

Bunker specification: ISO 8217 1996 (E RME25)

For each and every bunkering, 5 samples for vessel, supplier and analysis samples, to be taken from ship's manifold only, always in the presence of bunker supplier and chief engineer. In case of dispute DNV Petroleum Service, Fuel Quality Testing Programme (FQT) or equivalent to be binding. Costs to be shared equally between Owners and Charterers.

In order to comply with the terms and conditions of the various bunker suppliers, the sample to govern quality shall be the sample drawn jointly by the supplier and by the ship's chief engineer or surveyor appointed by Owners. Analysis of said sample in accordance with the ISO 8217 test methods at a mutual agreed reputable and dedicated laboratory shall be binding and conclusive for both parties.

Any claim in relation to fuel purchased by Charterers shall be notified to the Charterers, in the first instance, within 30 days from the date of delivery of the said fuel, with documentation to be provided as early as practicably possible in order to enable Charterers to process the necessary claims against suppliers. Absence of notification within 30 days from delivery will be deemed as waiver of such claim.

Quantity supplied shall be finally determined by sounding of the vessel's tanks.

**Clause 45: Cargo Claims / P & I Club**
Owners guarantee that the vessel is entered and shall remain entered in a Protection and Indemnity organisation (AXA is an insurance company) for the duration of this Charter Party. Owners guarantee that vessel's P&I coverage is equivalent or better than if the vessel had been covered by a P&I Club which is a member of the International group of P&I clubs. Entry shall include, but not be limited to ordinary cover for cargo claims.

It shall be considered a fundamental breach by Owners if the vessel's P & I cover or class is cancelled or suspended during the currency of this Charter.

Charterers are (not) responsible for any accident or damage to or on board the vessel which is normally covered with Owners Hull & Machinery Policy. Charterers are fully P&I covered with SKULD, Copenhagen.

In the case of damage to and/or loss of cargo carried on the vessel in which Owners and/or Charterers' liability could be involved under the terms of this Charter Party, as the case may be, the Owners and/or Charterers shall on request grant reasonable time extension for commencement of suit in each and every

ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 10TH NOVEMBER 2003
MV "PATHFINDER"



occurrence. Such extensions shall not prejudice the ultimate responsibility of both parties. Liability for cargo claims, as between Owners and Charterers, shall be apportioned as specified by the Interclub New York Produce Exchange Agreement effective from 1996, and its subsequent amendments.

If required by Charterers, Owners to authorise and Instruct Owners' P & I Club to confirm directly to any Party as ordered by Charterers that the vessel is fully covered for P & I and that collection of premiums are up-to-date.

## Clause 46: Certificates/Vaccinations.
Owners are obliged to deliver and maintain throughout the currency of this Charter Party the vessel, her crew and anything pertaining hereto supplied with up-to-date and complete certificates (including Oil Pollution Certificates), approvals, equipment and fittings, enabling the vessel and her crew to trade within the trading limits and to load, carry and discharge all cargoes permitted under this Charter Party.

Officers and crew to comply with vaccination and sanitary regulations in all ports of call and corresponding certificates to be available onboard, enabling the vessel to obtain free pratique by radio.

If requested, Owners to provide Charterers with copies of any and all such certificates/approvals.

Any time lost and all extra directly related expenses resulting from Owners' non-compliance with the above to be for Owners' account and same may be deducted from hire.

## Clause 47:
The Charterers may deduct from the charter hire any amount disbursed for Owners' account provided agreed with Owners in advance for any items in excess of USD 200.00.

In addition Charterers may deduct from last hire payment(s) the reasonable estimated expenses incurred by Charterers for Owners' account, notwithstanding that vouchers may not then have reached Charterers for submission to Owners, but maximum USD 200.00.

## Clause 48: Delivery/Redelivery Time
Actual time on hire to be calculated basis Greenwich Mean Time.

## Clause 49: Double Banking
Charterers have the right to load and/or discharge on double banking basis or bay any other means available at loading and/or discharging port or place always subject to master's reasonable satisfaction and any additional equipment / facilities such as fenders, whenever considered necessary by the master, are to be supplied by the Charterers in their time and at their expense.

If at any time during operation, the master reasonably considers it unsafe to continue due to adverse weather conditions etc. he may order the other vessel(s) or barge(s) away from his vessel or remove his own vessel in order to avoid prejudicing the safety of the vessel(s). Any additional insurance premium net of all rebates, if required by vessel's underwriters, to be for Charterers' account. Amount not to exceed the lowest premium obtainable on the London market for single vessel cover premium to be confirmed by Charterers in writing prior double-banking.

## Clause 50: Hold condition on First Voyage.
Vessel on arrival first load ports of first voyage to present with all holds clean, dry, free from rust and previous cargoes and in every respect ready to receive Charterers' intended cargo to Charterers' surveyor's satisfaction. Failing such survey vessel shall be off-hire until rectified and any/all extra costs directly resulting from such failure shall be for Owners' account including but not limited to stevedores' standby but limited to the present shift affected. If failing Owners to immediately take all necessary steps to have vessel passed with minimum delay including but not limited to the hiring of shorelabour.

15

ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 10TH NOVEMBER 2003
MV "PATHFINDER"



**Clause 51: ITF/Boycott.**
Owners warrant that the vessel's crew is and will be during the period of this Charter Party employed under a Bona Fide Union Agreement, the standard of which is fully acceptable to the I.T.F. and is approved by ITF affiliated unions in all countries not excluded in this Charter Party.

In the event of the vessel being denied or restricted in the use of port and/or loading and/or discharging facilities or shore labour and/or tug or pilotage assistance or of any other restriction, detention or any loss of time whatsoever due to boycott or arrest of the vessel or due to Government restrictions, all caused by the vessel and/or by reason of the terms and conditions on which members of the crew are employed or by reason of any trading of this or any other vessel under same Ownership or operation or control, the payment of hire shall cease for the time thereby lost and all extra directly related expenses incurred due to above are to be for Owners' account and may be deducted from hire. Owners are also responsible for any valid claim that may be presented by third Party.

**Clause 52: Inspection.**
The Charterers and/or their Supercargo(es) shall have free and unlimited access to the whole vessel including but not limited to bridge, holds, engine room, all vessel's tanks including bunker, lubricating oil, sludge, ballast water, freshwater tanks during the Charter period. Whenever required, the Master must bring the vessel to an even trim to ensure correct bunker soundings. The Charterers and/or their Supercargo(es) and/or Surveyor(s) to have free and unlimited access to the vessel's deck and engine log books, radio logs, tank plans, calibration scales and/or other plans as requested and are allowed to make copies of same.

**Clause 53: Insurance.**
Premium for basic war risks insurance on Hull and Machinery and Officers/crew always to be for Owners' account. Any additional premium including blocking and trapping net of all rebates in respect of these risks solely arising from the vessel proceeding at the Charterers' request to areas designated as excluded areas by vessel's war risk Underwriters to be for Charterers' account, however, same not to exceed what would have been quoted or charged for single vessel cover on the London Market. Premium to be confirmed by Charterers in writing prior entering area. If Owners have not covered basic war risks Insurance, Charterers only to pay the differential as if Owners were covered and only against presentation of Underwriters' original Invoice.

**Clause 54: Laying Up/Return Insurance**
Deleted.

**Clause 55: Loading of Steel**
If the vessel is nominated to load a full or part cargo of steel products an independent surveyor to be appointed by Owners to perform a pre-loading condition survey findings of which to be conclusive and binding for the cargo documents to be issued and cost and time for said survey to be divided equally between Owners/Charterers.

In addition to Clause 5, it is understood that Owners and master are familiar with and accepts the "California block stowage" method for loading of steel slabs.

**Clause 56: Notices.**
Notices to be given directly to Charterers in Copenhagen tlx nr 22200 or atlas@atlas-shipping.com

**Clause 57: Off-Hire.**
Should the vessel put back whilst on voyage by reason of any accident or breakdown, or in the event of loss of time either in port or at sea or deviation upon the course of the voyage caused by sickness of or accident to the crew or any person onboard the vessel (other than Supercargo travelling by request of the

16

ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 10TH NOVEMBER 2003
MV "PATHFINDER"



Charterers) or by reason of the refusal of the Master or crew to perform their duties, or by reason of salvage other to save life, or oil pollution, even if alleged, or capture/seizure, or detention or threatened detention by any authority including arrest, the hire shall be suspended from the time of the inefficiency until the vessel is again efficient in the same or equidistant position in Charterers' option, and voyage resumed therefrom, always, however, to the extent that Charterers' operations are hindered. All extra directly related expenses incurred including bunkers consumed during period of suspended hire shall be for Owners' account.

The Charterers may in their option, partly or wholly, add any off-hire period(s) to the Time Charter period.

During any off-hire period estimated to exceed 8 days, the Owners to give the Charterers not less than 5 days definite notice of resumption of the service.

If the vessel has been off-hire for a period of more than 30 days, the Charterers are at liberty to cancel the balance of this Charter Party, in which case redelivery shall take place upon vessel being free from cargo, irrespective of redelivery ranges.

### Clause 58: Oil Pollution

Owners guarantee to provide and maintain during the entire time Charter period, at their expense and carry on board the vessel a valid U.S. Certificate of Financial Responsibility. Owners also guarantee to have secured current certificates for other countries/Federal states or municipal or other division or authority thereof, where guarantees are required. All such certificates to be valid throughout the entire Time Charter period.

The Charterers shall in no case be liable for any damages as a result of the Owners' failure to obtain the aforementioned certificates. Time lost by non-compliance to be considered as off-hire and may be deducted from hire and Owners hold Charterers harmless against any consequential losses, damages and expenses.

### Clause 59: On/Off-Hire Survey.

At port of delivery or first load port and at last discharge port prior to redelivery a joint on/off-hire bunker survey to be held. If time is actually lost due to the surveys being held then the on-hire survey to be in Owners' time and off-hire survey to be in Charterers' time.

The survey(s) to be performed by a single independent surveyor jointly appointed and costs will be equally shared between Owners and Charterers.

Charterers/Owners have the right to order joint survey(s) by Charterers' own surveyor/port captain and Owners to be represented by ship's and Master/Chief Engineer in which case each party to pay for their own surveyor's cost. Further, the Charterers have the option to use Master's/Chief Engineer's bunker figures on delivery and to perform survey on redelivery and/or vice versa. Bunker quantities measured jointly to be final and binding on both the Owners and the Charterers.

Charterers will have free and unlimited access to all vessel's compartments, tanks, drawings, plans, manuals, etc. and to deck and engine logbooks with the right to request delivery of copies of same.

### Clause 60: Panama/Suez Canal.

Owners warrant that the vessel is fitted for the transit of the Suez and Panama Canal in loaded and/or ballast condition and complies with all and any regulations of the relevant canal authority and shall not be subject to any conditions of transit not customarily required by the relevant canal authority whether pursuant to their regulations or otherwise. Should the vessel not comply with the warranties contained in this clause and/or any regulations or conditions of transit laid down by the relevant canal authority, Charterers may suspend hire for all time lost and Owners to pay all expenses resulting as a consequence of Owners' failure to comply with this warranty.



ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 10TH NOVEMBER 2003
MV "PATHFINDER"

**Clause 61: Plans.**
Owners to courier to the Charterers, Capacity Plan, Deadweight Scale, and General Arrangement Plan latest within 7 days after fixing.

**Clause 52: Power Clause.**
The vessel to supply free of expense to Charterers 440 volt 3 phase 60 cycles and 40 kva per crane from the power supply panel in each cranehouse. Charterers have the right to fit/connect magnets, grabs or other loading/discharging equipment customary to the trade onto vessel's cranes and/or power supply.

**Clause 63: Protective Clauses.**
The General Clause Paramount, the Both-to-Blame Collision Clause, the New Jason Clause, Baltic Conference War Risks Clause for Time Charters 1993 (Code name: Conwartime 1993), P & I Bunkering Clause, as applicable and attached, are all to be considered as incorporated into this Charter party and all Bills of Lading issued under this Charter shall be subject to all said Clauses except Conwartime 1993, but shall also be subject to Voywar 1993.

Should a particular trade on which the vessel is employed apply the U.S.A. or the Canadian Clause Paramount compulsorily then such Clauses to be considered incorporated into this Charter and shall be incorporated into Bills of Lading on that trade.

**Clause 64: Punctual Payment.**
With reference to Clause 5, the Owners to give Charterers three (3) New York banking days' written notice excluding Sundays and Holidays to rectify a failure to make punctual and regular payment before exercising their right of withdrawal.

**Clause 65: Sea Carrier Initiative Agreement.**
Owners and Charterers confirm they are both signatories to the Sea Carrier Initiative Agreement in order to co-operate with the U.S. Customs Service in the fight against drug menace.

**Clause 66: Stevedore Damage.**
Any damage caused by stevedores during the currency of this Charter Party shall be reported by the captain to the Charterers or their agents in writing within 24 hours of the occurrence or as soon as possible thereafter, the captain shall immediately arrange in conjunction with Charterers' agents for the damage to be surveyed and an estimate of the repair cost given, if possible. The captain shall use his best efforts to obtain written acknowledgement by responsible parties causing damage unless damage should have been made good in the meantime. Stevedore damages involving seaworthiness shall be repaired without delay to the vessel after each occurrence in Charterers' time and shall be paid for by the Charterers. Other minor repairs shall be done at the same time, but if this is not possible, same shall be repaired while vessel is in dry-dock in Owners' time, provided this does not interfere with Owners' repair work or by vessel's crew at Owners' convenience.

Any time spent in repairing stevedore damage shall be for Charterers' account. Charterers shall pay for stevedore damage whether or not payment has been made by stevedores to the Charterers.

**Clause 67: Taxes.**
Taxes and/or dues and/or charges whatsoever imposed on cargo by any local or national authorities, arising out of trade under this Charter Party to be borne by Charterers. Taxes levied by Governments other than that of Owners' domicile or vessel's flag on earnings under this Charter party other than the on hire payable to Owners shall be for Charterers' account.

**Clause 68: Warranties.**
.   To the best of Owners' knowledge, the vessel:
    -   Is not blacklisted by Arab countries nor anywhere else within the agreed trading limits.

pathfinder 10.11.2003 tcadas                                - B -

18

ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 15TH NOVEMBER 2003
MV "PATHFINDER"



- Has not traded Cuba and Israel,
- Is eligible for bunkers in the United States of America, its territories and possessions, in accordance with directives from the United States Department of Commerce, Office of International Trade.

**Clause 69: Watertight Hatches.**
Owners warrant that vessel's hatch covers are to be watertight. At loading ports Charterers' option to examine vessel for leakages, from ballast and wing tanks into main holds and hatch covers to be hose tested for water tightness, which will be effected with assistance of vessel's crew and equipment, which assistance to be free of expenses to Charterers, provided adequate equipment available on board failing which same to be supplied/delivered and removed by Charterers / shippers at their risk and expense and in their time. The test for the hatch covers water tightness shall be affected by using the vessel's regular on deck fire hose with a pressure of 2 bar and at a distance of 1.5 metres.

If repairs are required then same to be affected by Owners and vessel to go off hire until vessel passed as water tight by Charterers' surveyor. (If Charterers, however, elect to load some holds then vessel to be paid hire pro rata to number of holds actually loaded.)

**Clause 70: Weather Routing.**
The Charterers may supply an Independent Weather Bureau's advice to the Master, during voyages specified by the Charterers and the Master shall comply with the reporting procedure of the Weather Bureau, however, the Master remains responsible for the safe navigation and choice of route. Alternatively Charterers have the option to instruct the Master to report daily to a Weather Bureau during the execution of the voyages. The Weather Bureau will subsequently produce a performance analysis report.

Evidence of weather conditions shall be taken from the vessel's deck logs and Independent Weather Bureau's report. Every 30 days Owners/Charterers shall make a mutual assessment of the weather routing company's findings and the deck logs in order to settle amicably any minor discrepancies.

**Clause 71: Towage, Pilotage, etc.**
The Owners authorize the Charterers, as Agents of and on behalf of the Owners and/or the vessel, to arrange and contract for any towage, pilotage or the like service on usual or customary terms and/or those terms offered or required by towing/pilotage companies employed where such services are furnished.

**Clause 72: War Cancellation.**
In the event of war, whether declared or undeclared involving Japan or Denmark or between any two or more countries of U.S.A., C.I.S., United Kingdom, People's Republic of China, directly affecting the performance of this Charter, either Party has the right to cancel this Charter or any remaining portion thereof.

**Clause 73:**
Deleted

**Clause 74: Year 2000 Compliance.**
Year 2000 conformity shall mean that neither performance nor functionality of computer systems, electronic and electro-mechanical or similar equipment will be affected by dates prior to or during the year 2000.

Notwithstanding their other rights, obligations and defences under this Charter Party including those of the Hague or Hague Visby Rules, the Owners warrant the vessel's Year 2000 conformity insofar as this has a bearing on the performance of this Charter Party.

**Clause 75: ISM**
From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the

19


**Lightship**
Chartering A/S

ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 10TH NOVEMBER 2003
MV "PATHFINDER"

vessel and the Company (as defined by the ISM Code) shall comply with the requirements of the ISM
Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and
Safety Management Certificate (SMC) to the Charterer. Except as otherwise provided in this Charter Party,
loss, damage, expense or delays caused by failure on the part of the Owners or the Company to comply
with the ISM Code shall be for the Owners' account.

Clause 75: Lien.
In the event that Charterers have a contractual or statutory right of lien over cargo carried on board for hire,
freight, deadfreight or demurrage Owners shall co-operate with Charterers in exercising a lien over the cargo
and shall retain possession of the cargo on their behalf and deal with the cargo on Charterers' instructions.

Clause 77: Description Clause.
MV 'Pathfinder' ex Iokos Garnet
Singledecker/grab/bulkcarrier
Class NKK highest
Cyprus flag
Built 1982
31.793 mt dwat on 10.401 m saw
28,749 cbm grain in main holds and hatchways
5 holds/hatches
5 x 15 mt swl cranes
5 grabs each 5 cbm

| | | |
|---|---|---|
| Hatch dimensions | : no 1 | 17.5 x 12.60 |
| | : no 2/3/4/5 | 17.6 x 12.60 |
| Hatch dimensions | : 179.50 m/26.00 m | |
| Loa/beam | : 18430/10685 | |

GT/NT
About 13 knots on about 21.75 mt (laden) / 19.75 mt (ballast) RME 25 plus about 2.50 mt DMB
Port consumption idle          : about 2.50 metric tons DMB
Port consumption working       : about 4.00 mt DMB
All figures about
Vessel's grabs are at Charterers free disposal, Crew to drive the vessel's cranes free of charge to Charterers
where same is permitted by local regulations.

| | |
|---|---|
| P and I club | : The American Club |
| Registered Owners | : Messrs. Atlantide Company Ltd., Nicosia |
| Managers | : Messrs. Phoenix Vision Management Inc Marshall Islands |
| Commercial agents | : Messrs. Prom Ltd London |

Otherwise described as per Owners' reply to Charterers' Questionnaire (Baltic-Form) in Clause 82.

Clause 78 – Redelivery Ranges:
On dropping last outward seapilot one safe port in Charterers' option, world wide within trading limits, at any
time day or night Sundays and Holidays included.

Clause 79 – Dry Docking
Owners will dry-dock the vessel latest 06th November 2004.
If Owners dry-dock the vessel prior commencement of the Charter and the dry-dock period put the vessel
outside her cancelling date, this cancelling date to be extended accordingly.

Clause 80
Deleted.

- 10 -

pathfinder 10.11.2003 tt atlas

2(



Lightship
Chartering A/S

ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 10TH NOVEMBER 2008
MV "PATHFINDER"

Clause 81 – Purchase Option:
Charterers have the option to purchase the vessel at any time during this Timecharter at USD 4,500,000
gross less 1 per cent brokerage to Messrs. Lightship Chartering A/S, Copenhagen and 1 per cent to Messrs.
Lerbrot.

Memorandum of Agreement to be based on NSF latest edition and same to be mutually agreed upon in due
course and prior vessels delivery into this Timecharter.

Clause 82 – QUESTIONNAIRE
1.   General

1.1        Vessel's name:
           PATHFINDER

1.2        Vessel's previous name(s):
           KOLODS GARNET, OCEAN GARNET

1.3        Flag:
           CYPRUS

1.4        Month/year and where built:
           OCTOBER 1982 – SHIMIZU, JAPAN

1.5        Yard name and number:
           NIPPON KOKAN KABUSHIKI KAISHA / No.399

1.6        Official class register number/Lloyds number:
           CLASS NK

1.7        Class of vessel:
           NS* (BC) (ESP) MNS*

1.8        Port of registry:
           LIMASSOL

1.9        Owners (full style and contact numbers)
           ALTAPRIDE COMPANY LIMITED
           VYRONOS 36 (8TH FLOOR), NICOSIA TOWER CENTRE
           PC 1506 NICOSIA
           CYPRUS

1.10       Managers:
           PHOENIX VISION MANAGEMENT INCORPORATED
           53–55 AKTI MIAOULI, PIRAEUS 185 36, GREECE
           T +30 210 4599901 – F +30 210 4599902

1.11       Disponent Owners for the purpose of this C/P:
           (if applicable)

2    Particulars of vessel

2.1        Type of vessel:
           BULK CARRIER



ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 10TH NOVEMBER 2003
MV "PATHFINDER"

2.2     State following:

| Deadweight (all told) | Deadweight | Draft | TPC (metric tons) |
|---|---|---|---|
| Summer | 31,793 MT | 10.401 M | Abt 40.7 MT. |
| Winter | 30,914 MT | 10.195 M | Abt 40.5 MT |
| Tropical | 32,575 MT | 10.617 M | Abt 40.7 MT |
| Fresh Water | 32,792 MT | 10.603 M | Abt 40.750 MT |
| Tropical FW | 32,656 MT | 10.549 M | Abt 40.923 MT |

2.3     Is vessel fitted for transit of:

A) Panama Canal? YES/no
B) Suez canal? YES/no
C) St. Lawrence Seaway? yes/NO

2.4     For Panamax size vessels state deadweight (metric tons) basis tropical fresh water density
0.9954: NnOT APPLICABLE

2.5     Is Panama deadweight affected by vessel's bilge turn radius? yes/NO

2.6     For St. Lawrence Seaway size vessels state dead weight metric tons) basis 26' 2" fresh water:
(21,275 MT)

2.7     GT/NT:
International: 18,430 MT / 10,685 MT
Suez:         19,563 MT / 17,454 MT
Panama:       19,963 MT / 15,027 MT
British:      17,849 LT / 10,348.46 LT

2.8     Length overall (meters):     179.90 M

2.9     Length between Parpendiculars (meters): 171.90 M

2.10    Extreme breadth (meters) and depth moulded: 26.00 M / 14.50 M

2.11    Distance from waterline to top of hatch coaming (hatch covers if side rolling hatches) No. 1
hatch, (midship/last hatch) in

A. Fully loaded condition: 5.34M (EVEN KEEL)
B. Full Ballast condition (ballast holds not flooded):
No.1: 11,90 M   · Midship: 7,06 M   Last hatch: 5,85 M
C. Full ballast condition (ballast holds flooded): NOT APPLICABLE

2.12    State vessel's deballasting time in metric tons per hour: 200 MT/H

2.13    Vessel can accept loading rate of (metric tons per hour): 400 MT/HR

2.14    Distance from keel to
Hatch top (hatch coaming if side rolling): ABT 15.60 M
Highest fixed point of vessel: ABT 44.10 M

2.15    State capacity of

ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 10TH NOVEMBER 2003
MV "PATHFINDER"



**Lightship**
Chartering A/S

A. Ballast tanks: 10,230.6 CUBM
B. Hold ballast capacity (state which hold(s): NOT APPLICABLE

2.16   Constant excluding fresh water
Daily freshwater consumption: 9.0 MT
Fresh water capacity: 277.1 MT
State capacity and daily production of evaporators: 15 MT / ABT 9-10 MT
Normal fresh water reserve: 100 MT

2.17   Vessel is fitted with shaft generator (yes/NO)

2.18   State vessel's onboard electrical supply
(110 V/ 60 Hz)

State details of alternative supply, if any

3.   Cargo arrangements

3.1   Holds:

A. Number of holds: 05
B. Are vessels holds clear and free of any obstructions: YES/no
C. Grain capacity in holds excluding wing/top side tanks both in CUBM and CBFT
H/No.1:      6,008 CUBM / 212,178.25 CBFT
H/No.2: 8,073.7 CUBM / 285,282.648 CBFT
H/No.3: 8,015.2 CUBM / 283,100.11 CSFT
H/No.4: 8,015.7 CUBM / 283,082.46 CFT
H/No.5: 7,679.1 CUBM / 271,159.77 GFT

D. Grain capacity by hold including hatch ways (CUBM/CBFT)
H/No.1:      6,197.7 CUBM / 218,877.97 CBFT
H/No.2: 8,269.5 CUBM / 292,045.65 CBFT
H/No.3: 8,207.0 CUBM / 289,838.41 CBFT
H/No.4: 8,296.5 CUBM / 259,620.75 CFT
H/No.5: 7,868.9 CUBM / 277,898.07 CFT

Bale Capacity: (CUBM/C3FT)
H/No.1:      5,810.7 CUBM / 205,210.68 CBFT
H/No.2: 7,972.2 CUBM / 281,546.2. CBFT
H/No.3: 7,878.4 CUBM / 278,233.57 CBFT
H/No.4: 7,878.4 CUBM / 276,233.57 CFT
H/No.5: 7,621.6 CUBM / 269,154.42 CFT

E. Is vessel strengthened for the carriage of heavy cargoes
(yes/NO) CARGO HOLDS NOS 1 & 5 ARE STRENGTHENED FOR LOAD COIL (STEEL)
If yes state which holds may be left empty: NO ALTERNATE HOLD LOADING.

F. Is tanktops steel and suitable for grab discharge (YES/no)

G. State whether corrugations vertical or horizontal: VERTICAL

H. Tank top strength (metric tons per SQM): ABT 15.00 MT/SQM .


Lightship
Chartering A/S

ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 10TH NOVEMBER 2003
MV "PATHFINDER"

I. Are holds CO2 fitted (yes/NO)

J. Are holds fitted with smoke detection system (yes/NO)

K. Is vessel fitted with Australian type approved hold ladders (YES/no)

L. Has vessel a loadmaster computer/loadicator or other type of mechanical stowage calculator (YES/no)

M. Are holds hoppered at:

HOLD SIDE
Forward bulkhead
Aft bulkhead
Can vessel's holds be described as box shaped (YES/no)

N. Measurement of any tank slopes/hoppering (height and distance from vessel's side at tank top)
   HOLDS Nos. 1 & 5 – HEIGHT OF HOPPERS: 3,0M
   HOLDS Nos. 2, 3 & 4 – HEIGHT OF HOPPERS: 2,64 M
   DISTANCE FROM SIDE SHELL: 2,64 M

O. Flat floor measurement of cargo holds at tank top:

| H/No. | LENGTH | BREADTH |
|-------|--------|---------|
| 1 | 24,4 M | FWD: 5.6 M , AFT: 20.0 M |
| 2 | 25,4 M | FWD: 20.0 M , AFT: 20.4 M |
| 3 | 26,0 M | FWD: 20.6 M , AFT: 20.6 M |
| 4 | 26.2 M | FWD: 20.6 M , AFT: 20.6 M |
| 5 | 26.8 M | FWD: 20.4 M , AFT: 13.3 M |

P. Is vessel of ventilated (yes/NO)

If yes state numbers of air changes per hour basis empty holds

3.2   Hatches

A. Number of hatches: 05

B. Make and type of hatch covers e.g. end folding or side rolling: MAC GREGOR, TYPE KVAERNER BRUG, END FOLDING

C. Hatch sizes:
No.1: ABT 17.5 X 12.6 M / No.2 & 5: ABT 17.6 X 12.6 M

D. Strength of hatch covers in metric tons per SQM: ABT 1.37

E. Distance from ship's rail to edge of hatch covers/ coaming each side: ABT 5.80 M

F. Distance from bow to for of 1st hold opening: ABT 15.70 M

G. Distance from stern to aft of last hold opening: ABT 37.10 M

H. Is vessel fitted with cement holes (YES/no)



**Lightship**
Chartering A/S

ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 10TH NOVEMBER 2003
MV "PATHFINDER"

**4    Speed/consumption/fuel engine**

4.1    State vessels consumption at about 13 knots (up to Beaufort scale force 4/douglas sea
state 3) as follows:

About tons (IFO)    About tons (MDO)

| | | |
|---|---|---|
| A. Laden: | 21.5 MT | 2.5 MT |
| B. Ballast: | 19.5 MT | 2.5 MT |

4.2    Bunker grades IFO / MDO: ISO 8217:1996(E) RNE 25  / ISO 8217 1996(E) DMB

6.3    Permanent usable bunker capacities IFO / MDO: IFO: 1,358 MT / MDO: 230 MT (excluding
unpumpables which are 25(metric tons)

4.4    Port consumption per 24 hours idle/working 3/24 hours
IDLE:        ABT 0.9 MT/8HRS        ABT 2.5 MT/24HRS
WORKING:    ABT 1.7 MT/8HRS        ABT 5.0 MT/24HRS

4.5    Engine Make and type: NKK-SEMT PIELSTICK, 16PC2-5V

4.6    Max output BHP / RPM: 10,400 K 518/125 RPM

**5.    Banking information**

5.1    Full style and address of Owners bank for freight/hire remittance

Emporiki Bank of Greece S.A., Shipping Division (Branch 120)
114 Kolokotroni & 15 II Merarchias Street
Piraeus 185 35 Piraeus
T + 30 210 4226740
F + 30 210 4226779

5.2    Account number and name:
A/C No.: 610099810015
A/C Name: Phoenix Vision Management Inc.

5.3    IBAN: GR20012012000000010099810015

5.4    SWIFT: EMPOGRAA

**6.    Classification society, surveys and certificates**

6.1    Name of Classification society: CLASS NK

6.2    Date of last special survey: JULY 2002

6.3    Date of last annual survey: JULY 2002

6.4    A. Is vessel entered in a classification approved enhanced survey program YES
B. Date of last inspection: 10 NOVEMBER 2001
C. Date of next inspection: NOVEMBER 2004

ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 10TH NOVEMBER 2003
MV "PATHFINDER"

**Lightship**
Chartering A/S

6.5   Date and last place of last dry-dock: NOVEMBER 2001 – GUANGZHOU, CHINA

5.6   Has vessel been involved in any pollution incidents in the last 12 months? If so give full
      details: NO

6.7   Has vessel been involved in any groundings or collision in the last 12 months? If so give
      full details:     YES, COLLISION WITH TUGBOAT "AMANCAY" SUSTAINED ON
      11 OCTOBER 2002 AT KM. 132 OF PARANA RIVER, ARGENTINA. INDENTED SHELL
      PLATING AND INTERNAL STRUCTURE IN WAY, BETWEEN FRAMES 225-220 (P) & (S),
      AT 11400MM FROM BASE LINE. TO BE REPAIRED BY NEXT REGULAR DOCKING
      SURVEY IN NOV 2004.

5.8   Is vessel ISM certified (YES/no)

      Give date of last and next audit: INTERIM AUDIT 14 OCT 2003
                                        NEXT AUDIT NO LATER THAN 13 APRIL 2004

      State recommendations made, if any: NONE

6.9   Advise date and place of last port state control: WILMINGTON, USA. 19 NOV 2003

6.10  Did vessel pass port state control inspection without detention or recommendations?
      YES

6.11  Is vessel's crew covered by full ITF or bone fide trade union agreement acceptable to
      ITF  (yes/no): BONE FIDE

6.12  If vessel has ITF agreement state number, date of issue and expiry date: NO

5.13  Certificates

| Certificate name | date of issue | Date of expiry | Date of last annual end/sement | SS |
|---|---|---|---|---|
| | | | | 07/07 |
| Loadline | 13/11/2003 | 28/07/2007 | 28/07/2003 | |
| Safety equipment | 13/11/2003 | 28/07/2007 | 28/07/2003 | |
| Gear Survey | 12/05/01 | May 2005 | 24/04/2003 | |
| Safety Radio | 13/11/2003 | 28/07/2007 | 23/07/2003 | |
| Int Oil Pollution | 13/11/2003 | 28/07/2007 | 28/07/2003 | |
| Deratization | 22/08/2003 | 22/02/2003 | | |
| CPA/COFR | 12/11/2003 | 12/15/2006 | | |

6.14  Does any recommendations appear on any of the above certificates (yes/NO)
      If yes state full details

6.15  IMO registration number: 9101006

5.16  Expiry data of FMC Certificate (FMC Certificate: unknown). SMC: 13/04/2004

ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN; 10TH NOVEMBER 2003
MV "PATHFINDER"


Lightship
Charting A/S

7   Communication

    7.1   Call sign: P3N53

    7.2   Name of radio station which vessel currently monitoring: NA

    7.3   Inmarsat A phone number: 008737 62610264 / 008717 62610263

    7.4   Inmarsat A fax number: 008717 62610265

    7.5   Inmarsat A Telex number: E-mail: Pathfinder@gtships.com

    7.6   Inmarsat C Telex number:

8   Insurance

    8.1   Hull and machinery insured value:

    8.2   Name of Owners P and I Insurers: THE AMERICAN CLUB

9   Crew

    9.1   Number of crew: 24

    9.2   Name and nationality of master: NOEL D. DUANE, FILIPINO

    9.3   Nationality of officers: FILIPINO

    9.4   Nationality of crew: FILIPINO

10  Miscellaneous

    10.1   Has vessel called at C.I.S. (Russian) Far East pacific ports in the last 15 months
           (yes/NO)
           If so when and where.

    10.2   State last 5 (five) cargoes carried with load and discharge port(s):
           1. VERMICULITE/CHROME ORE/TITANIUM SLAG –
           LOADING: RICHARD'S BAY
           DISCHARGING: WILMINGTON, CAMDEN, BALTIMORE, LAKE CHARLES
           2. WHEAT
           LOADING: HAMBURG
           DISCHARGING: PORT SUDAN
           3. ALUMINA
           LOADING: PORT KAISER, JAMAICA
           DISCHARGING: DUNKIRK
           4. ALUMINA
           LOADING: PARANAM, TEMBLADORA
           DISCHARGING: BALTIMORE
           5. STEEL BILLETS
           LOADING: MOIRANA
           DISCHARGING: BARCELONA

27

29. Jan. 2008  20:34    No. 5090  P. 26

ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 10TH NOVEMBER 2003
MV "PATHFINDER"



**Lightship**
Chartering A/S

10.3  Is vessel fitted for carriage of grain in accordance with chapter IV of Solas 1974 and amendment without requiring bagging strapping and securing when loading a full cargo (deadweight) of heavy grain in bulk (stowage factor 42 CSFT) with ends untrimmed? (YES/no)

10.4  State number of holds which may be left slack without requiring bagging, strapping and securing: HOLDS Nos. 1 & 5

11    Cargo gear (only to be completed if applicable)

11.1  If geared state make and type: CRANE FUKUSHIMA 15T

11.2  Number and capacity of cranes/derricks and where situated: 35 CRANES X 15T.

11.3  Outreach of gear beyond ship's rail: 5,0 M

11.4  If gantry cranes/horizontal slewing cranes state minimum clearance distance crane hook to top of hatch coaming: NOT APPLICABLE

11.5  Time needed for full cycle with maximum cargo lift on hook:

11.6  Slewing/luffing/hoisting speeds:
      SLEWING: 1.25 RPM
      LUFFING: MAX. APPROX 30 SEC
      HOISTING: WITH LOAD OF 15T, 0-32.5 MTRS/MN

11.7  Is gear combinable for heavy lift (yes/NO)

11.8  Are winches electro-hydraulic? (YES/no)

11.9  Consumption of MDO working cranes per 8 hours and 24 hours: ABT 1,70 MT/8HRS
      ABT 5,0 MT/24HRS

11.10 If vessel has grabs onboard state type and capacity: ELECTRO-HYDRAULIC TYPE,
      5.5 CUBM

11.11 Is vessel fitted with sufficient lights at each hatch for night work? (YES/no)

12    Container bulkers (only to be completed if applicable) : NOT APPLICABLE
13    Tweendeckers (only to be completed if applicable): NOT APPLICABLE
14    Supplemental Information for specific commodities
15    Other Information

**Clause 83: Delivery Ranges**
Vessel to be delivered (local time) on dropping last outward seapilot 1 safe port or passing following ranges, at any time day, night, Sunday and holidays included:

Singapore/Japan range including islands, including Malaysia, Indonesia, Thailand, Philippines Islands, Vietnam, Taiwan, P.R.C., South Korea OR Skaw/Mediterranean range OR Montreal/Bahia Blanca Range OR Gibraltar/Durban range OR Aden/Singapore range but if Arabian Gulf, Persian Gulf, then redelivery on passing Muscat outbound, if Red Sea then redelivery on passing Aden.

---ooo---



ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 10TH NOVEMBER 2005
MV "PATHFINDER"

## GENERAL AVERAGE AND THE NEW JASON CLAUSE:

General Average shall be payable according to the York/Antwerp Rules 1974 as amended 1990, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply:-

## NEW JASON CLAUSE:

In the event of accident, danger, damage or disaster before or after the commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence for which, the carrier is not responsible, by statute, contract or otherwise, the goods, shippers, consignees or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery

## BOTH-TO-BLAME CLAUSE:

If the liability for any collision in which the vessel is involved while performing this charter party falls to be determined in accordance with the laws of The United States of America, the following clause shall apply:-

## NEW BOTH-TO-BLAME COLLISION CLAUSE:

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or noncarrying ship or her owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the owners of the said goods, paid or payable by the other or non carrying ship or her owners to the owners of the said goods and set off, recouped or recovered by the other or non carrying ship or her owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contract".

And the charterers shall procure that all Bills of Lading issued under this charter party shall contain the same clause.

## P. & I. BUNKER DEVIATION CLAUSE 1948:

The vessel in addition to all other liberties shall have liberty as part of the contract voyage and at any stage thereof to proceed to any port or ports whatsoever whether such ports are on or off the direct and/or customary route or routes to the ports of loading or discharge named in this charter and there take oil bunkers in any quantity in the discretion of owners even to the full capacity of fuel tanks, deep tanks and any other compartment in which oil can be carried whether such amount is or is not required for the chartered voyage.

## GENERAL PARAMOUNT CLAUSE:

This Bill of Lading shall have effect subject to the provisions of any legislation relating to the carriage of goods by sea which incorporates the rules relating to Bills of Lading contained in the International Convention, dated Brussel 25th August, 1924 and which is compulsory applicable to the contract of carriage herein contained. Such legislation shall be deemed to be incorporated herein, but nothing herein contained



ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 10TH NOVEMBER 2003
MV "PATHFINDER"

shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its
responsibilities or liabilities thereunder. If any term of this Bill of Lading be repugnant to any extent
to any legislation by this clause incorporated, such term shall be void to that extent but no further. Nothing
in this Bill of Lading shall operate to limit or deprive the Carrier of any statutory protection or exemption
from or limitation of liability.

## BIMCO STANDARD WAR RISKS CLAUSE FOR TIME CHARTERS, 1993
### Code Name: "CONWARTIME 1993"

(1) For the purpose of this Clause, the words:

(a) "Owners" shall include the shipowners, bareboat Charterers, disponent Owners, managers or other
operators who are charged with the management of the Vessel, and the Master and

(b) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities,
revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported),
acts of piracy, acts of terrorism, acts of hostility or malicious damage, blockades (whether imposed against
all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or
crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any
state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous
or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the
Vessel.

(2) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or
required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway
or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the
reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks.
Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or
to become dangerous, after her entry into it, she shall be at liberty to leave it.

(3) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether
such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of
certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an
area where she shall be subject, or is likely to be subject to a belligerents' right of search and/or
confiscation.

(4) (a) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and
their other interests (including, but not limited to, loss of earnings and detention, the crew and their
Protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.

(b) If the Underwriters of such insurance should require payment of premiums and/or calls because,
pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, any area or
areas which are specified by such Underwriters as being subject to additional premiums because of War
Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same
time as the next payment of hire is due.

(5) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional
wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then
such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as
the next payment of hire is due.

(6) The Vessel shall have liberty:-

ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 19TH NOVEMBER 2003
MV "PATHFINDER"



(a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(b) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(d) to divert and discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(e) to divert and call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(7) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(8) If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

29. Jan. 2008 20:55                                              No. 5099    P. 30
02.AUG.2007 15:55 3032210933041S          MULTISUN          86743 P.002

COPY

**Addendum No. 1**
**to Charter Party dated Copenhagen 10th November, 2003**
**M.V. "Pathfinder" (Renamed "Comet Star")**

The following has this day been mutually agreed between Castor Star Maritime
S.A., Marshall Islands – as Owners and Atlas Shipping A/S, Denmark – as
Charterers

"Charterers have place the vessel at Owners disposal for dry docking on 26th/June at
Singapore.

Owners to redeliver the vessel back into Charterers service passing Singapore or in
Charterers option equidistant. In case Charterers manage to fix the vessel 1st
employment after the dry-dock with a load port closer that the distance to Singapore,
Charterers to take delivery opt 1st load port.

Period between disp Singapore and actual redelivery point ref above to be treated as
off-hire period from Singapore until redelivery to charterers service. This off-hire sum
not be added up at the end of the on duration.

Owners to keep Charterers posted on vessels expected time of re-delivery passing
Singapore with minimum 15/10/7/5/3/2/1 days notices of redelivery.

Unless otherwise agreed vessel to be redelivered with about same bunkers remaining
on board as on handon disp Singapore"

Otherwise all other terms and conditions to remain unaltered as per present Charter
Party dated Copenhagen 10th November, 2003.

Owners agree to waive their claim against charterers on bunkers, supplied St.
Petersburg.

Owners agree to waive their claim against charterers for damages occurred in St.
Petersburg due to ice trading.

Piraeus 13 July 2007

THE OWNERS                          THE CHARTERERS

# EXHIBIT 2

## AGREEMENT

This Agreement dated 29th November 2007 is between:-

Atlas Shipping A/S ("Atlas")
and
Castor Star Maritime S.A. ("CSM")

**WHEREAS:**

(1)   By an MOA dated 8th August 2006, CSM contracted to buy and the vessel's former owners, Atlapride Company Limited ("Atlapride") contracted to sell the vessel "CASTOR STAR" ("the Vessel") (ex Pathfinder). The Vessel was at that time on charter to Atlas pursuant to a charterparty dated 10th November 2003 ("the Charter");

(2)   On or about 4th September 2006, a Tripartite Agreement was signed by CSM as buyers, Atlapride as sellers and Atlas as charterers. This was to novate the Charter;

(3)   Clause 81 of the Charter provided for a purchase option in Atlas's favour ("the Option");

(4)   On 16th October 2007, Atlas exercised the Option;

(5)   A dispute arose between CSM and Atlas as to whether the Option was extant, valid and enforceable ("the Dispute"). The Dispute was referred to an expedited hearing in London ("the Reference").

(6)   The Vessel remains on hire and is proceeding on a laden voyage to Dakar where its ETA is 12th December 2007. The Vessel is expected to complete discharge in 14 days. Atlas will redeliver the Vessel to CSM on completion of discharge.

**IT IS HEREBY AGREED (for good and mutual consideration, the sufficiency whereof the parties hereto hereby acknowledge) AS FOLLOWS:**

1.   Subject to the condition precedent provided for in clause 2 hereof, Atlas shall accept and CSM shall pay the sum of US$3.2 million (Three Million Two Hundred Thousand United States Dollars) ("the Settlement Sum") in full and final settlement of the Dispute, inclusive of all interest.

2.   It is a condition precedent to the validity of this Agreement that payment of the Settlement Sum million is made in accordance with clause 3 hereof, and received into the account stated in paragraph 3 (a). If the foregoing condition precedent has not been fulfilled within 0900 London time on Monday, 3rd December 2007, then this Agreement shall automatically be rescinded ab initio, and shall cease to bind the Parties hereto.



3. (a) Upon signature hereof, CSM shall give irrevocable instruction to their bank to remit the Settlement Sum to the following account with the value date being the date of the this Agreement.

> DANSKE BANK A/S
> HOLMENS KANAL AFDELING
> HOLMENS KANAL 2-12
> 1090 COPENHAGEN K.
> DENMARK
> TELEX        : 27000
> SWIFT ADD.   : DABADKKK
> USD ACCOUNT NO. : 3001 356275
> USD IBAN NO.    : DK41 3000 3001 356275
> IN FAVOUR OF    : ATLAS SHIPPING A/S
> REF.            :

> VIA CORRESPONDING US BANK:

> BANK OF AMERICA N.A.,
> NEW YORK BRANCH
> U.S.A.
> SWIFT ADD.    : BOFAUS3N
> IN FAVOUR OF  : DANSKE BANK, COPENHAGEN
> ACCOUNT NO.   : 6550253668

(b) CSM will forthwith provide to Atlas a copy of the swift remittance confirmation.

4. Both parties shall bear their own legal costs of and occasioned by the Reference and the Dispute. Each Party shall bear 50% of the total fees of the Tribunal in the Reference, 50% of the transcription fees of the hearing in the Reference, and 50% of the cost of the venue and catering for the hearing in the Reference.

5. Upon receipt of the Settlement Sum, Atlas shall forthwith give instructions to their Panamanian lawyers to discharge the injunction granted on the application of Atlas on 1st November 2007. CSM hereby confirm that they have no claim whatsoever which can or might be made against the counter-security provided by Atlas in respect of the said injunction. CSM undertake promptly to take all steps which may be necessary in order to procure the release of the said counter-security in full to Atlas, and to assist Atlas as may be necessary with the discharge of the injunction.

6. With effect upon receipt of the Settlement Sum, Atlas shall not arrest, re-arrest, injunct the Vessel and / or any other assets owned by or in the control of CSM or in the management of Multibulk Marine Management S.A. and / or CSM in respect of the Dispute or any claim relating to the Option.



7. Both Parties shall fulfil their respective obligations under the Charter, the terms of which remain in full force and effect (save as provided for below in relation to clause 81 of the Charter). In particular:

    (a) CSM shall procure that the Vessel proceeds directly, in accordance with the Charter to and enters the Dakar, and will there discharge the cargo presently on board the Vessel in accordance with the Charter.

    (b) CSM shall not lien, arrest, prevent or hinder the discharge and delivery of the cargo presently on board the Vessel in any way. Any breach of clauses 7 (a) or (b) of this Agreement shall cause this Agreement to be rescinded ab initio, with the result that the Dispute shall not have been settled.

8. Upon receipt of the Settlement Sum and the completion of discharge at Dakar, Atlas shall confirm in writing that they irrevocably give up and surrender the Option. The said confirmation shall be in the form attached hereto at Schedule 1. The original confirmation shall be signed forthwith upon signature of this Agreement, but the original shall not be issued until completion of discharge at Dakar. The original shall be held in escrow by Ince & Co, who undertake not to release the same to CSM but instead to return it to Atlas forthwith if this Agreement is rescinded, and who further undertake only to release the same if this Agreement remains in effect upon completion of discharge at Dakar. In the meantime, a copy of the confirmation marked "Draft – Not Effective until due fulfilment of the Agreement dated 29th November 2007" shall be provided to CSM.

9. CSM accept that:

    (a) The Vessel has underperformed since departure from Kohsichang on her present voyage, and that the estimated time lost as a result of the underperformance is (as of the date hereof) 11 days;

    (b) The Vessel was off-hire in Kohsichang for non-signing of the bills of lading by the Master for 2 days;

    (c) The final hire statement will reflect the above;

    (d) It is accepted that the payment of hire made by Atlas on or about 16th September 2007 shall stand as payment of hire for the period from APS Kohsichang on 3rd October 2007, and that any and all issues as to hire, off-hire, performance and bunkers in respect of the period prior to 3rd October 2007 are hereby settled.

CSM agree to co-operate with all reasonable requests in dealing with the sub-charterers and / or cargo interest and responding to requests for information or clarification arising out of (inter alia) the purported withdrawal of the Vessel.

10. If this Agreement is rescinded in accordance with the provisions above, Atlas shall return the Settlement Sum to CSM.



11.    This Agreement is subject to English law and the exclusive jurisdiction of the Tribunal appointed in the Reference.

SIGNED FOR AND ON BEHALF OF ATLAS SHIPPING A/S

Signed for and on behalf of Cantor Star Maritime.

Date: 29/11/2007.

# EXHIBIT 3

01.SEP.2006 19:08 00302104294415          MULTIBULK          40833 P.002          C
                        C0302104294415

## TRIPARTITE DEED

THIS DEED is dated 18th August, 2006 and made

BETWEEN:

(1)  ATLAPRIDE COMPANY LIMITED, of Cyprus, a company incorporated and existing under the laws of the Republic of Cyprus, having its registered office at 36 Vyronos Avenue, Nicosia Tower Center (8th Floor), PC 1506, Nicosia, Cyprus (hereinafter called the "Original Owners"),

(2)  CASTOR STAR MARITIMB S.A., of the Marshall Islands, a company incorporated and existing under the laws of the Marshall Islands, having its registered office at Trust Company Complex, Ajaltake Road, Ajaltake Island, Majuro, Marshall Islands MH 96960 (hereinafter called the "New Owners"),

(3)  ATLAS SHIPPING A/S, of Denmark, a company incorporated under the laws of Denmark, having its registered office in Copenhagen, Denmark (hereinafter called the "Charterers").

WHEREAS:

a)  By a Memorandum of Agreement dated 8th August, 2006 (the "MOA") entered into between the Original Owners, as sellers, and Multibulk Marine Management S.A., of Monrovia, Liberia (hereinafter called "Multibulk") for a company to be nominated, as buyers, the Original Owners agreed to sell and Multibulk for and on behalf of its nominees have agreed to buy the m.v. PATHFINDER (ex IOLCOS GARNET) (hereinafter called the "Vessel").

b)  By an Addendum No. 1 dated 18th August, 2006 to the MOA, entered into between the Original Owners and Multibulk, and countersigned by the New Owners, Multibulk nominated the New Owners as the nominated buyers of the Vessel.

c)  By a Charterparty dated 10th November, 2003 thereto (including purchase option Memorandum of Agreement entered between Original Sellers and Charterers dated 5th April 2004) entered into between the Original Owners and the Charterers as amended by Addendum No. 1 thereto (together the "C/P") the Original Owners agreed to charter out and they chartered out the Vessel to the Charterers and the Charterers agreed to charter in and they chartered in the Vessel from the Original Owners.

NOW THEREFORE THIS DEED WITNESSETH as follows:

(J08-085002.A)

28

41

01.SEP.2006 16:08 00302104294415          MALTBULK                    #0632 P.003

00302104294415                                                      C

1.

a.   The Original Owners hereby agree to deliver the Vessel to the New Owners pursuant to the MOA and the Addendum No. 1 thereto, after completion of discharge of fertilizers cargo in South America, which is expected to be concluded during September 2006, together with the balance of the C/P;

b.   The New Owners hereby agree to take delivery of the Vessel pursuant to the MOA and the Addendum No. 1 thereto, after completion of discharge of fertilizers cargo in South America, which is expected to be concluded during September 2006, together with the balance of the C/P and hereby agree to be bound by the terms and conditions of the C/P in place of the Original Owners under the C/P as of the time of delivery of the Vessel to them under the MOA and the Addendum No. 1 thereto;

c.   The Charterers hereby agree that, as from the date/time of transfer of ownership and delivery of the Vessel by the Original Owners to the New Owners pursuant to the MOA and the Addendum No. 1 thereto, after completion of discharge of fertilizers cargo in South America, which is expected to be concluded during September 2006, hire will accrue in favour of the New Owners and they shall be and remain bound by all the terms and conditions of the C/P towards the new Owners.

2.   The New Owners will have no liabilities to the Charterers under the C/P in respect of claims arising/arisen and related to the period prior to delivery of the Vessel to the New Owners under the MOA. Original Owners will have no liabilities to the Charterers under the C/P or otherwise in respect of claims that will arise and will be related to the period after the delivery of the Vessel to the New Owners under the MOA.

3.   The Charterers to settle any outstanding payments and accounts due to the Original Owners direct with the Original Owners.

4.   Upon the transfer of ownership, quantity of bunkers remaining on board the Vessel will remain Charterers' property.   The New Owners will settle the bunkers cost with Charterers at the end of the C/P.

5.   The New Owners warrant vessel to fly Panamanian flag and retain Class NK Classification Society as well as American Club Protection and Indemnity cover.

6.   The New Owners understand CP duration includes any off-hire period incurred by Sellers, currently standing at approximately 70 days.

(008-0852093A)

29

42

04.SEP.2006 15:08  00302101294115            MILTFBUCK                    50832 P.004

C

00302104294415

7.    This Deed shall be governed by, and construed in all respects in
      accordance with English law.

8.    Except as otherwise expressly provided in this Deed, all terms and
      conditions contained in the C/P shall remain in full force and effect.

IN  WITNESS  WHEREOF  this  Deed  was  duly  executed  and
unconditionally delivered on the date first above written.

SIGNED as a Deed by

            JOHN A GALANI        Attorney in Fact

For and on behalf of
Atlapride Company Limited

SIGNED as a Deed by

            LAMBROS STRAVELAKIS

For and on behalf of
Castor Star Maritime S.A.    Director.

SIGNED as a Deed by

For and on behalf of    ANDERS DAHL
Atlas Shipping A/S

(008-085093A)

30

43